EDDIE R. JIMENEZ (SBN 10376)
ejimenez@aldridgepite.com
**ALDRIDGE PITE, LLP**
7220 South Cimarron Road, Suite 140
Las Vegas, NV 89113
Telephone: (858) 750-7600
Facsimile: (619) 590-1385

**Mailing Address**:
4375 Jutland Drive, Suite 200
P.O. Box 17933
San Diego, California 92177-0933

Attorneys for Shellpoint Mortgage Servicing

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re: MELANI SCHULTE and WILLIAM SCHULTE, | Case No.: 09-29123-BAM |
| | Chapter 11 |
| | Jointly Administered with: |
| 2704 SATTLEY LLC, HOT ENDEAVOR LLC, 1341 MINUET LLC, 1708 PLATO PICO LLC, 2228 WARM WALNUT LLC, 9425 VALLEY HILLS LLC, 9500 ASPEN GLOW LLC, 5218 MISTY MORNING LLC, CHERISH LLC, SABRECO Inc., KEEP SAFE LLC | 09-27238-BAM 09-27909-BAM 09-27910-BAM 09-27911-BAM 09-27912-BAM 09-27913-BAM 09-27914-BAM 09-27916-BAM 09-28513-BAM 09-31584-BAM 09-31585-BAM |
| | **SHELLPOINT MORTGAGE SERVICING'S RESPONSE TO DEBTOR'S MOTION FOR CONTEMPT FOR VIOLATION OF THE AUTOMATIC STAY AND DISCHARGE INJUNCTION, FAILING TO COMPLY WTH COURT ORDER AND THE CONFIRMED PLAN AND FOR DAMAGES INCLUDING ATTORNEYS FEES AGAINST CREDITORS, SHELLPOINT MORTGAGE SERVICING AND OCWEN LOAN SERVICING, LLC [DKT NO. 1334]** <br> **Hearing**: <br> Date: May 26, 2021 <br> Time: 9:30 a.m. <br> Judge: Hon. Mike K. Nakagawa |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION…………………………………………………………....2

II.  STATEMENT OF FACTS…………………………………………………….4

    A.  LOAN HISTORY……………………………………………….........4

    B.  THE FIRST BANKRUPCY CASE…………………………………........5

    C.  THE SECOND BANKRUPCY CASE…………………………………......6

    D.  THE THIRD BANKRUPCY CASE……………………………….......7

    E.  THE MOTION FOR CONTEMPT…………………………………......7

    F.  SHELLPOINT'S COMPLIANCE WITH THE CONFIMRED PLAN ........ 8

III. ARGUMENT………………………………………………………………….9

    A.   SHELLPOINT SHOULD NOT BE HELD IN CONTEMPT UNDER 11

    U.S.C. § 105 AS IT IS IN COMPLIANCE WITH THE CONFIRMATION

    ORDER AND DISCHARGE ORDER…………………………………......9

        1.   Legal Standard……………………………………….........9

        2.   Shellpoint is in Compliance with the Confirmation Order and

        Discharge Order……………………………….........................10

    B.   SHELLPOINT DID NOT VIOLATE THE AUTOMATIC STAY............... 12

        1.   Legal Standard……………………………………….........12

        2.   The Automatic Stay Terminated Upon Entry of the Confirmation

        Order........................................................................................12

    C.   SANCTIONS ARE NOT APPROPRIATE UNDER THE COURT'S

    INHERENT AUTHORITY AS SHELLPOINT DID NOT ACT IN BAD FAITH

    OR WITH WILLFUL MISCONDUCT…………..…………….………….……13

        1.  Legal Standard…………………………………………….....13

        2.  Shellpoint Did Not Intentionally Violate a Court Order to Warrant

        Sanctions or Contempt…………………………………………..14

**D.    DEBTOR IS NOT ENTITLED TO DAMAGES FOR VIOLATION OF THE DISCHARGE INJUNCTION** …………………………………..………..……...15

    **1.  Legal Standard**……………………………………………....15

    **2.  The Informational Statements Complied with the Confirmed Plan and Did Not Violate the Discharge Injunction**……………………………...14

    **3.  The Terms of the Subject Loan and Confirmed Plan Permitted the Payment of Taxes and Insurance**……………………………………17

    **4.  Shellpoint's Actions were Objectively Reasonable Given the Debtor's Default under the Confirmed Plan** ……………………………….....17

    **5.  Debtor Has Failed to Demonstrate She Suffered Damages or that Shellpoint Caused Said Damages**…..….......…......…......…......…......19

    **6.  Debtor Failed to Mitigate Damages** .......…......…......…......…....22

    **7.  Punitive Damages are Not Appropriate in this Case**…......…........22

**IV.    CONCLUSION**…………………………………………………….... 23

1

## TABLE OF AUTHORITIES

2

3   **Cases**                                                                    **Page**

4   *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991) ……………………………………………14

5   *Collier on Bankruptcy* ¶ 524.02[2][c] (15th ed. 1999)…………………………………………..21

6   *Espinosa v. United Student Aid Funds, Inc.,* 553 F.3d 1193, 1205 n. 7 (9th Cir.2008) …………15

7   *Dawson v. Washington Mutual Bank (In re Dawson)*, 390 F.3d 1139, 1148 (9th Cir. 2004)…...20

8   *Fink v. Gomez*, 239 F.3d 989, 991-93 (9th Cir. 2001) ………………………………………13, 14

9   *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1137-38 (9th Cir.

10  2001)…………………………………………………………………………………….……………...10

11  *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir. 1999) …………...…………...19

12  *McClaran v. Plastic Indus., Inc.,* 97 F.3d 347, 361 (9th Cir.1996) …………...………………20

13  *Perry v. O-Donnell*, 759 F.2d 702, 706 (9th Cir. 1985)…………………………………………22

14  *Renwick v. Bennett (In re Bennett)* ………….……………………………….……………...15

15  *Roadway Express, Inc. v. Piper,* 447 U.S. 752 (1980) ……………………………………13

16  *Shadduck v. Rodolakis,* 221 B.R. 573, 585 (D.Mass.1998)…………………………………...21

17  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 824 (9th Cir.2001)…....20

18  *Sucre v. MIC Leasing Corp. (In re Sucre),* 226 B.R. 340, 351 (Bankr.S.D.N.Y.1998)…………21

19  *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801, 1804 (2019) ………………………………13, 15, 16

20  *United States v. Arkison (In re Cascade Roads, Inc.),* 34 F.3d 756, 767 (9th Cir.1994) …….…15

21  *United States v. Price,* 176 B.R. 807, 808 (N.D.Ill.1993), *aff'd,* 42 F.3d 1068 (7th Cir.1994)….21

22  *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002)……………..9, 10,15,20, 21

23  *In re 1601 W. Sunnyside Dr. #106, LLC*, 2010 WL 5481080, at *6 (Bankr. D. Idaho Dec. 30,

24  2010) ………………………………………………………………………………………20

25  *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002)………………………………………...…9, 10

26  *In re Bloom*, 875 F.2d at 228……………………………………………………………23

27  *In re Brock Utils. & Grading, Inc.,* 185 B.R. 719 (Bankr.E.D.N.C.1995)………………………21

28  *In re Craine,* 206 B.R. 594 (Bankr.M.D.Fla.1997)…………………………………………21

*In re Dyer,* 322 F.3d at 1193…….. …………………………………………………………20, 23

*In re Houlik*, 481 B.R. 661, 673 (10th Cir. BAP 2012) ……………………………………12

*In re Mallow Hotel Corp.*, 18 F.Supp. 869 (M.D. Pa. 1937) ………..…..…..……..……10

*In re McHenry,* 179 B.R. at 165, 168………………………………………………...21, 23

*In re McLaughlin,* 96 B.R. at 563………………………………………………......21

*In re McLean,* 794 F.3d at 1322………………………………………………………18

*In re Pace,* 67 F.3d 187, 193 (9th Cir.1995) …..………………………………………...15

*In re Rainbow Magazine*, 77 F.3d 278, 284 (9th Cir. 1996) ………….…………………...13

*In re Roman*, 283 B.R. 1, 12 (B.A.P. 9th Cir. 2002)………………………………21, 22

1  EDDIE R. JIMENEZ (SBN 10376)
   ejimenez@aldridgepite.com
2  **ALDRIDGE PITE, LLP**
   7220 South Cimarron Road, Suite 140
3  Las Vegas, NV 89113
   Telephone: (858) 750-7600
4  Facsimile:  (619) 590-1385

5  **Mailing Address**:
   4375 Jutland Drive, Suite 200
6  P.O. Box 17933
   San Diego, California 92177-0933
7
   Attorneys for Shellpoint Mortgage Servicing
8
                **UNITED STATES BANKRUPTCY COURT**
9
                     **DISTRICT OF NEVADA**
10
11 In re: MELANI SCHULTE and          | Case No.: 09-29123-BAM
   WILLIAM SCHULTE,
12                                     | Chapter 11

13                                     | Jointly Administered with:

   2704 SATTLEY LLC,
14 HOT ENDEAVOR LLC,                   | 09-27238-BAM
   1341 MINUET LLC,                    | 09-27909-BAM
15 1708 PLATO PICO LLC,               | 09-27910-BAM
   2228 WARM WALNUT LLC,               | 09-27911-BAM
16 9425 VALLEY HILLS LLC,             | 09-27912-BAM
   9500 ASPEN GLOW LLC,                | 09-27913-BAM
17 5218 MISTY MORNING LLC,            | 09-27914-BAM
   CHERISH LLC,                        | 09-27916-BAM
18 SABRECO Inc.,                      | 09-28513-BAM
   KEEP SAFE LLC                       | 09-31584-BAM
                                       | 09-31585-BAM

19                                     | **SHELLPOINT MORTGAGE
                                       | SERVICING'S RESPONSE TO
20                                     | DEBTOR'S MOTION FOR CONTEMPT
                                       | FOR VIOLATION OF THE
21                                     | AUTOMATIC STAY AND DISCHARGE
                                       | INJUNCTION, FAILING TO COMPLY
22                                     | WTH COURT ORDER AND THE
                                       | CONFIRMED PLAN AND FOR
23                                     | DAMAGES INCLUDING ATTORNEYS
                                       | FEES AGAINST CREDITORS,
24                                     | SHELLPOINT MORTGAGE
                                       | SERVICING AND OCWEN LOAN
25                                     | SERVICING, LLC [DKT NO. 1334]**

26                                     | **Hearing**:
                                       | Date: May 26, 2021
27                                     | Time: 9:30 a.m.
                                       | Judge: Hon. Mike K. Nakagawa
28

                              - 1 -
   **SHELLPOINT MORTGAGE SERVICING'S RESPONSE TO MOTION FOR CONTEMPT**

Shellpoint Mortgage Servicing ("Shellpoint") hereby files its *Response to Debtor's Motion for Contempt for Violation of the Automatic Stay and Discharge Injunction and Failure to Comply with a Court Order and the Confirmed Plan and for Damages Including Attorneys' Fees Against Creditors, Shellpoint Mortgage Servicing and Ocwen Loan Servicing LLC* ("Ocwen") ("Motion for Contempt") [Docket 1334], Declaration of Shellpoint Mortgage Servicing ("Shellpoint Declaration"), and related Exhibits ("Exhibits") in Support of its Response (collectively, the "Response").

## I.    **INTRODUCTION**

On October 11, 2009, Melani Schulte (the "Borrower" or "Debtor") filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, Case No. 09-29123-MKN (the "First Case"). On March 8, 2011, the Court entered an Order Confirming a Plan in the First Bankruptcy Case (the "Confirmation Order" or ("Confirmed Plan"). The Confirmation Order effectively modified secured claims encumbering the Debtor's thirty-two (32) rental properties, including the Subject Loan, now serviced by Shellpoint.

Following entry of the Confirmation Order in the First Case, it is uncontroverted the Debtor defaulted under the terms of the Confirmed Plan by failing to make the required monthly mortgage payments to Shellpoint and maintain her obligations to timely pay taxes and insurance for the Property. At the same time, Debtor alleged many creditors failed to comply with the Confirmation Order by correctly updating records to reflect the modification of claims in the Confirmed Plan. Shellpoint is currently in compliance with the Confirmation Order from the First Case. Subsequently, the Debtor filed two additional bankruptcy cases under the name of her controlled entity, Schulte Properties, LLC ("SPLLC").

Notwithstanding Shellpoint's compliance with the Confirmed Plan, on April 23, 2021, Debtor filed the instant Motion for Contempt against Shellpoint and one of the prior loan servicers, Ocwen, related to the Subject Loan in First Case. In the Motion for Contempt, Debtor alleges Shellpoint failed to comply with the Confirmation Order in the First Case, violated the Discharge Order, and violated the automatic stay. Due to the alleged violations, Debtor seeks actual [unspecified] damages against Shellpoint, including emotional distress damages under §§105,

362(k), and 524. Further, Debtor requested punitive damages, sanctions, and an award of attorneys' fees and costs incurred, with amounts to be determined at a hearing.

First, Shellpoint asserts it is in compliance with the Confirmation Order from the First Case and has been in compliance for years. Notably Shellpoint had no involvement in the Debtor's First Case nor the alleged compliance issues that followed. Rather, when Shellpoint acquired servicing rights to the account in August 2015, the Subject Loan already reflected a default based on the Debtor's failure to make payments under the Confirmed Plan. Shellpoint completed multiple audits of the Subject Loan to verify its compliance with the Confirmed Plan (and the Debtor's default). In an attempt to demonstrate Shellpoint's non-compliance with the Confirmed Plan, Debtor submitted monthly informational statements, loss mitigation letters, and notices regarding the real Property in support of its Motion for Contempt. However, the referenced documents clearly show Shellpoint's compliance with the Confirmed Plan, the completion of system updates, and the Debtor's default. As Shellpoint is in compliance with the Confirmation Order, it is no longer necessary or appropriate to determine whether Shellpoint is in contempt or otherwise force its compliance with the terms of a court order under §§ 105(a) or 524.

Second, Shellpoint asserts the automatic stay terminated upon entry of the Confirmation Order in 2011 or, at the latest, upon entry of the Discharge Order in 2015. There is currently no automatic stay in effect to support a claim for an ongoing stay violation. Additionally, Debtor attempts to classify herself with Chapter 7 debtors who receive a discharge and there is no expectation of receiving communications/correspondence from creditors. Debtor and Shellpoint have an ongoing contractual relationship based on the terms of her Confirmed Plan and Shellpoint's servicing of a 30-year loan secured by her real property. A contract she immediately breached by failing to make payments on the modified loan. As such, Shellpoint believed it was reasonable for it to provide Debtor information regarding the status of the Subject Loan and ascertain whether Debtor needed loss mitigation assistance based on her default under the terms of the confirmed Chapter 11 Plan. Additionally, based on the terms of the Debtor's Chapter 11 Plan, it was objectively reasonable for Shellpoint to believe the automatic stay terminated upon entry of the Confirmation Order and/or Discharge Order.

Third, Shellpoint did not act in bad faith or with willful misconduct to warrant sanctions under § 105(a) or punitive damages. To the contrary, Shellpoint has acted in good faith to resolve this matter, most recently, through the Judicial Settlement Conference. However, the Debtor has acted in bad faith by continuing to collect rent from the Property for years without making payments on the Loan.

Fourth, Shellpoint asserts any statements sent to the Debtor were: (i) for informational purposes only based on the Debtor's default under the Confirmed Plan, (ii) not sent with an intention to collect a debt from the Debtor personally, but rather to enforce rights as to the Property; (iii) sent to assist the Debtor with potential loss mitigation; and (iv), were objectively reasonably given the Debtor's default under the Confirmed Plan.

Finally, even assuming *arguendo* Debtor could satisfy the elements for a willful violation of the discharge injunction under § 524, stay violation under § 362, or the Court finds Shellpoint in contempt under § 105(a), Debtor has failed to establish she is entitled to any damages or that Shellpoint (as opposed to some other servicer) caused said damages. Indeed, the Debtor has successfully moved the Property, and approximately 30 other properties, in and out of bankruptcies while transferring the properties to shell entities for the benefit of the automatic stay and in furtherance of her scheme to collect rents while failing make to payments on the loans. The Debtor has pocketed hundreds of thousands of dollars over the last ten years without making payments on the loans secured by her properties. For Debtor to now seek redress from the Court as an individual, while seeking to also obtain relief via an LLC in the Third Case, all with soaking unclean hands over the last ten years is disingenuous at best and in bad faith at worst.

## II. <u>STATEMENT OF FACTS</u>

### A.    LOAN HISTORY

On October 14, 2004, Melanie Schulte executed a promissory note in the principal sum of $167,000.00 (the "<u>Note</u>"). The Note reflects it was specially indorsed to THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK,AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2004-28CB,

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2004-28CB ("Creditor"). (*See* **Exhibit A**, Declaration of Shellpoint Mortgage Servicing ("Shellpoint Declaration"); ¶4).

The Note is secured by a deed of trust (the "Deed of Trust") encumbering the real property located at 1392 Echo Falls Ave, Las Vegas, NV 89123 ("Property"). (*See* Exhibit A, Shellpoint Declaration, ¶5). The Note and Deed of Trust are correctly referenced as the "Subject Loan."

Pursuant to the terms of the Deed of Trust, Debtor is required to maintain real property taxes and hazard insurance for the Property, and Creditor is entitled to pay taxes/insurance on the Debtor's behalf and set up an escrow impound. (*See* Exhibit A, Shellpoint Declaration, ¶6; **Exhibit B**, Deed of Trust, ¶¶1-5).

The Deed of Trust was assigned to Creditor. (*See* Exhibit A, Shellpoint Declaration, ¶5).

On or about August 17, 2015, Shellpoint acquired servicing rights to the Subject Loan. (*See* Exhibit A, Shellpoint Declaration, ¶7).

On or about May 30, 2017, an unauthorized Grant, Bargain, Sale Deed was recorded in the Clark County Record's Office wherein the Debtor, Melani Schulte, purported to transfer her interest in the Property to Schulte Properties LLC for little to no consideration.

**B.    THE FIRST BANKRUPTCY CASE**

On October 11, 2009, Debtor filed the First Case as Case No. 09-29123.

On September 24, 2010, the Court entered an Order Approving the Stipulation for Adequate Protection ("APO") in the First Case between the Debtor and the prior loan servicer, Litton Loan Servicing. (*See* First Case, Dkt No. 703, 717). The APO required Debtor to make monthly adequate protection payments to Creditor in the amount of $708.60 commencing October 1, 2010. The adequate protection payments were *based on* a secured claim of $132,000.00 amortized over thirty (30) years at 5.00% interest per annum. Further, the APO provided Debtor shall timely perform all obligations under Secured Creditor's loan documents as they come due, including but not limited to the payment of real estate taxes, maintaining insurance coverage. (*See* **Exhibit C**, APO). Nothing in the APO permanently modified Creditor's Claim prior to confirmation of the Plan. Rather, the APO simply required the Debtor to make monthly adequate

1    protection payments to Creditor, and provided Creditor with default remedies in the event the

2    Debtor defaulted on the pre-confirmation payments.

3        On September 24, 2010, ORDER GRANTING MOTION TO VALUE COLLATERAL,

4    "STRIP OFF" AND MODIFY RIGHTS OF UNSECURED CREDITORS PURSUANT TO 11

5    U.S.C. § 506(a) AND § 1123 FOR THE REAL PROPERTY LOCATED AT 1392 ECHO FALLS

6    AVENUE, LAS VEGAS, NEVADA 89183 ("Valuation Order"). (*See* First Case, Dkt No. 716).

7    The Valuation Order bifurcated Creditor's Claim into a secured claim of $132,000.00 and an

8    unsecured claim of $25,603.21 through the Debtor's Chapter 11 Plan.

9        On March 8, 2011, the Court entered the Confirmation Order in the First Case, which

10   modified the Subject Loan. (*See* First Case, Dkt No 912).  The terms of the Confirmed Plan listed

11   Creditor's Claim in Class 2(m), and provided for a secured claim of $132,000.00 amortized over

12   thirty (30) years at 5.00% interest per annum with principal and interest payments of $708.60 per

13   month. The Confirmed Plan defined the "Effective Date" as the "eleventh business day following

14   the date of entry of the Confirmation Order." (*See* First Case, Confirmed Plan, §6.02).

15   Accordingly, the Effective Date of the Confirmed Plan occurred on March 23, 2011. As a result,

16   payments on the modified Claim were to commence April 1, 2011 and continue each month

17   thereafter until March 1, 2041. The Plan failed to address the payment of taxes or insurance on the

18   Property post-confirmation. Further, the Plan failed to include mandatory default provisions.

19   Copies of the Confirmation Order and Confirmed Plan are attached as **Exhibit D**.

20       On December 15, 2015, Debtor obtained a Chapter 11 discharge in the First Case. (*See*

21   First Case, Dkt No 1181-2).

22   **C.    THE SECOND BANKRUPTCY CASE**

23        Thereafter, Debtor allegedly transferred her interest in the Property to Schulte Properties,

24   LLC ("SPLLC").

25       Five (5) days after registering the entity with the Nevada Secretary of State, on May 31,

26   2017, SPLLC, filed a second Chapter 11 Bankruptcy Case and was assigned case number 17-

27   12883 (the "Second Case"). Debtor, Melani Schulte signed the petition as Managing Member of

28   the SPLLC. (*See* Second Case, Dkt. No. 1).

1   SPLLC failed to confirm a Chapter 11 Plan in the Second Case. On January 16, 2018, the

2   Court entered an Order Dismissing the Second Case. (*See* Second Case, Dkt. No. 99).

3   **D.    THE THIRD BANKRUPTCY CASE**

4   Several months later, on May 10, 2018, SPLLC commenced a third Bankruptcy Case by

5   filing a third voluntary petition under Chapter 11 of the Bankruptcy Code and was assigned case

6   number 18-12734-mkn (the "Third Case"). Debtor, Melani Schulte signed the petition as

7   Managing Member of SPLLC. (Dkt No. 1).

8   On September 12, 2018, Shellpoint filed *its Proof of Claim* in the Third Case reflecting a

9   secured claim of $171,520.96, including *pre-petition* arrears of $54,510.99 (the "Claim"). (*See*

10   **Exhibit E**, Third Case, Claim No. 16-1). The Proof of Claim indicated Shellpoint updated its

11   system to reflect the treatment of its Claim in the Plan from the First Case. Specifically, the Proof

12   of Claim reflected a reduced principal balance of $128,870.89, with an interest rate of 5.00%, and

13   Principal and Interest Payments of $708.60. Pursuant to the 410(A) Attachment, the Debtor failed

14   to make sixty-seven (67) Principal and Interest Payments of $708.60 each for the months of

15   November 1, 2012 – May 1, 2018. Further, the payment history reflected Shellpoint made

16   advances for taxes on the Property, resulting in an escrow balance. Shellpoint incurred other pre-

17   petition fees associated with the Debtor's default under the Confirmed Plan, including late charges,

18   attorneys' fees, foreclosure fees, inspection fees, appraisal fees, and property preservation fees.

19   Said fees were incurred after entry of the Confirmed Plan in the First Case. In support of the Claim,

20   Shellpoint attached a payment history, payment breakdown, all loan documents, an escrow

21   analysis, and copies of the Confirmation Order and Confirmed Plan from the First Case. (*See*

22   Exhibit E, Claim, Third Case, Claim No. 16-1).

23   On March 5, 2021, the Parties participated in a Judicial Settlement Conference in the Third

24   Case in an attempt to resolve the Debtor's default and any alleged compliance issues. However,

25   the Parties were unable to reach a resolution at the Judicial Settlement Conference.

26   **E.    THE MOTION FOR CONTEMPT**

27   Following the Judicial Settlement Conference, Debtor filed the *Motion for Contempt*

28   against Shellpoint and Ocwen in her First Case (First Case, Dkt No. 1334). Debtor alleges

Shellpoint failed to comply with the Confirmation Order in the First Case, violated the Discharge Order, and violated the automatic stay. The Motion for Contempt is supported solely with informational statements, notices, and loss mitigation offers allegedly sent by Shellpoint to the Debtor following entry of the Confirmation Order. *(See* Motion for Contempt, Exhibits 5-9). Due to the alleged violations, Debtor seeks actual [unspecified] damages against Shellpoint, including emotional distress damages under §§105, 362(k), and 524. Further, Debtor requested punitive damages, sanctions, and an award of attorneys' fees and costs incurred, with amounts to be determined. In support of the allegations, Debtor attached copies of informational statements allegedly received from Shellpoint following entry of the Confirmation Order in the First Case.

**F.    SHELLPOINT'S COMPLIANCE WITH THE CONFIMRED PLAN**

On or about August 17, 2015, Shellpoint acquired servicing rights to the Subject Loan. At the time of acquisition, the Subject Loan reflected the terms of the confirmed Plan and a substantial default. (*See* Exhibit A, Shellpoint Declaration, ¶¶7-8).

Shellpoint completed multiple audits to confirm its compliance with the Confirmed Plan and completion of system updates. Shellpoint is currently in compliance with the Confirmation Order from the First Case. (*See* Exhibit A, Shellpoint Declaration, ¶9).

The Subject Loan reflects a default based on the Debtor's failure to make all required Principal, Interest, and Escrow Payments under the Confirmed Plan. (*See* Exhibit A, Shellpoint Declaration, ¶11).

Any statements or correspondence sent by Shellpoint to the Debtor following entry of the Confirmed Plan or Discharge Order were: (i) for informational purposes only based on the Debtor's default under the Confirmed Plan, (ii) not sent with an intention to collect a debt from the Debtor personally, but rather to enforce rights as to the Property; and/or (iii) sent to assist the Debtor with potential loss mitigation. (*See* Exhibit A, Shellpoint Declaration, ¶12).

None of the statements were issued with the intent to collect a debt from the Debtor personally. The statements included express disclaimers advising Debtor the statements were for informational purposes only, advising Debtor of the status of her mortgage loan, and sent for purposes of enforcing the lien against the Property only.

1    The monthly statements Shellpoint sent to the Debtor reflected the terms of the Confirmed

2  Plan, including the correct principal balance, interest rate (5.00%), and Principal and Interest

3  Payment ($708.60). (*See* Exhibit A, Shellpoint Declaration, ¶13).

4    Although the Subject Loan was previously de-escrowed, the terms of the Note and Deed

5  of Trust required Debtor to maintain taxes and insurance and provide Shellpoint with proof of

6  adequate coverage in a timely manner. When the Debtor failed to maintain taxes and/or insurance,

7  Shellpoint advanced said funds on the Debtor's behalf and established an escrow account as

8  permitted by the terms of the Subject Loan documents. (*See* Exhibit A, Shellpoint Declaration,

9  ¶11).

10    As of May 11, 2021, the unpaid principal balance totals $122,615.59. As of May 11, 2021,

11  the past due payments on the Subject Loan total $53,912.40, with a current due date of September

12  1, 2015. This amount excludes corporate advances, late fees, attorneys' fees, and other charges

13  which may be contractually owed on the account (*See* Exhibit A, Shellpoint Declaration, ¶¶14-

14  15).

15

16                              **III.    ARGUMENT**

17  **A.  SHELLPOINT SHOULD NOT BE HELD IN CONTEMPT UNDER 11 U.S.C. § 105
        AS IT IS IN COMPLIANCE WITH THE CONFIRMATION ORDER AND
18      DISCHARGE ORDER**

19  **1. Legal Standard**

20    A party injured by a violation of a discharge injunction has no private cause of action for

21  damages under § 524 or § 105. *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002).

22  Rather, a violation under § 524(a) is enforced through the bankruptcy court's contempt authority

23  under §105(a). *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002).

24    The court's contempt authority under §105(a) is only a civil contempt authority and allows

25  only for civil sanctions as the appropriate remedy. Pursuant to 11 U.S.C. § 105, the court is

26  empowered with discretion to take any action or make any determination necessary or appropriate

27  to enforce or implement court orders or rules, or to prevent an abuse of process. 11 U.S.C. § 105(a).

28  Section 105(a) authorizes **only** such remedies as are **necessary and appropriate** to carry out the

provisions of Bankruptcy Code. *See Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002) (emphasis added). In a civil contempt proceeding, the moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002).  However, civil penalties must either be compensatory or designed to coerce compliance. *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1137-38 (9th Cir. 2001). Indeed the power of the bankruptcy court to contemn should be exercised sparingly so long as justice can be done. *In re Mallow Hotel Corp.*, 18 F.Supp. 869 (M.D. Pa. 1937).

**2.   Shellpoint is in Compliance with the Confirmation Order and Discharge Order**:

The language of § 105(a) authorizes ***only*** those remedies ***necessary*** to enforce the Bankruptcy Code. *Walls*, 276 F.3d at 507 (emphasis added). As discussed above, Shellpoint updated its system to reflect the modification of its claim in the First Plan. Shellpoint did not intentionally violate the terms of the Confirmation Order or Discharge Order as asserted by the Debtor. Indeed, Shellpoint believes it is in compliance with the First Plan. (*See* Exhibit A, Shellpoint Declaration, ¶9).

On or about August 17, 2015, Shellpoint acquired servicing rights to the Subject Loan. At the time of acquisition, the Subject Loan reflected the terms of the confirmed Plan and a substantial default. (*See* Exhibit A, Shellpoint Declaration, ¶7-8). Shellpoint completed multiple audits to confirm its compliance with the Confirmed Plan and completion of system updates. Shellpoint is currently in compliance with the Confirmation Order from the First Case. (*See* Exhibit A, Shellpoint Declaration, ¶9). Monthly statements sent by Shellpoint to the Debtor reflected the terms of the Confirmed Plan, including the correct principal balance, interest rate (5.00%), and Principal and Interest Payment ($708.60). (*See* Exhibit A, Shellpoint Declaration, ¶13).

Further, Shellpoint filed *its Proof of Claim* in the Third Case reflecting a secured claim of $171,520.96, including *pre-petition* arrears of $54,510.99. The Claim indicated Shellpoint updated its system to reflect the treatment of its Claim in the Plan from the First Case. Specifically, the Claim reflected a reduced principal balance of $128,870.89, with an interest rate of 5.00%, and Principal and Interest Payments of $708.60. Pursuant to the 410(A) Attachment, the Debtor failed

to make sixty-seven (67) Principal and Interest Payments of $708.60 each for the months of November 1, 2012 – May 1, 2018. Further, the payment history reflects Shellpoint made advances for taxes on the Property, resulting in an escrow balance. In support of the Claim, Shellpoint attached copies of the Confirmation Order and Confirmed Plan from the First Case. (*See* Exhibit E, Claim 16-2).

The Subject Loan reflects a default as ***the Debtor*** failed to comply with the Confirmed Plan by making all Principal, Interest, and Escrow Payments to Shellpoint. (*See* Exhibit A, Shellpoint Declaration, ¶11). As of May 11, 2021, the unpaid principal balance totals $122,615.59. As of May 11, 2021, the past due payments on the Subject Loan total $53,912.40, with a current due date of September 1, 2015. This amount excludes corporate advances, late fees, attorneys' fees, and other charge which may be contractually owed on the account (*See* Exhibit A, Shellpoint Declaration, ¶14-15).

While Shellpoint submitted evidence to demonstrate its compliance with the Confirmed Plan (and the Debtor's default), Debtor failed to submit evidence to suggest Shellpoint is currently in violation of the Confirmation Order (or any other court order). Nor has the Debtor objected to Shellpoint's Proof of Claim in the Third Case. Debtor cannot establish Shellpoint is currently in violation of a court order, or she suffered damages as a result of alleged non-compliance. Indeed, the Debtor has continued to receive the benefit of collecting rent without making payments on the Loan. Additionally, the Debtor failed to maintain insurance on the Subject Property or pay the taxes due regarding the Subject Property. As such. Shellpoint has been forced to insure the Subject Property against loss and pay the taxes to protect its priority interest in the Subject Property. All this while the Debtor pockets rent, makes incomplete payments, and remains in violation of the Confirmed Plan by failing to make all payments.

Shellpoint did not intentionally violate the terms of the Confirmed Plan or Discharge Order as asserted in the Debtor's Motion for Contempt. Shellpoint has since completed multiple audits to verify its compliance with the Plan. As such, it is not necessary or appropriate to hold Shellpoint in contempt to force compliance with the terms of a court order under § 105(a). Accordingly, the Debtor's Motion for Contempt must be denied.

## B.  SHELLPOINT DID NOT VIOLATE THE AUTOMATIC STAY

### 1.  Legal Standard

11 U.S.C. §362(c) provides:

> (1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;
>
> (2) the stay of any other act under subsection (a) of this section continues until the earliest of—
>
> > (A) the time the case is closed;
> > (B) the time the case is dismissed; or
> > (C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

11 U.S.C. §362(c). Pursuant to § 362(c)(1), the stay of an act against property of the estate continues only until such property is no longer property of the estate. 11 U.S.C. §362(c)(1). The automatic stay terminates upon confirmation pursuant to 11 U.S.C. §362(c)(1) as a Chapter 11 Plan typically revests property of the estate with the debtor. *In re Houlik*, 481 B.R. 661, 673 (10th Cir. BAP 2012).

### 2.  The Automatic Stay Terminated Upon Entry of the Confirmation Order

Debtor alleges Shellpoint violated the automatic stay of §362(a) by sending informational statements following entry of the Confirmation Order and Discharge Order. As a result, Debtor alleges she is entitled to damages under §362(k) based on a willful and ongoing stay violation. However, Debtor's Confirmed Plan expressly provided "[a]fter confirmation of the Plan, all property of the Debtors shall vest in the reorganized Debtors and the Holding Company." (*See* Plan, §6.05). As a result, the automatic stay terminated upon confirmation of the Plan on March 8, 2011. 11 U.S.C. §362(c)(1). Further, even assuming arguendo the Court concludes the automatic stay did not terminate upon entry of the Confirmation Order on March 8, 2011, the automatic stay terminated, at the latest, upon entry of the Discharge Order on December 15, 2015. 11 U.S.C. §362(c)(2)(C). In the Motion for Contempt, Debtor included statements and notices alleged received from Shellpoint. (*See* Motion for Contempt, Exhibits 5-9). However, the first correspondence is dated February 2, 2016, after the stay terminated. (*See* Motion for Contempt, Exhibits 5, Page 1). All correspondence allegedly sent by Shellpoint thereafter were sent after the

1    termination of the stay. As a result, there is no stay violation to support a claim for damages under
2    §362(k).

3        Shellpoint did not intentionally or willfully violate the automatic stay. Rather, Shellpoint
4    believed its actions were objectively reasonable in furtherance of its *in rem* rights and did not
5    violate the stay. (*See Taggart v. Lorenzen*, 139 S.Ct. 1795 (2019). Shellpoint verified completion
6    of system adjustments upon loan acquisition. The statements and notices sent to the Debtor
7    thereafter included appropriate bankruptcy disclaimers advising the Debtor the correspondence:
8    (i) is for informational purposes only regarding the status of the Subject Loan; and (ii) not an
9    attempt to collect a debt from the Debtor personally, but rather to enforce Shellpoint's rights
10   against the Property. As a result, Debtor has failed to establish Shellpoint willfully violated the
11   automatic following entry of the Confirmation Order or that damages are appropriate under
12   §362(k) for an ongoing stay violation. Accordingly, the Debtor's Motion for Contempt must be
13   denied.

14   **C. SANCTIONS ARE NOT APPROPRIATE UNDER THE COURT'S INHERENT**
     **AUTHORITY AS SHELLPOINT DID NOT ACT IN BAD FAITH OR WITH**
15   **WILLFUL MISCONDUCT**

16   **1.    Legal Standard**

17       In extreme cases, where conduct rises to the level of bad faith, the bankruptcy court may
18   also impose sanctions under its inherent sanction authority. *In re Rainbow Magazine*, 77 F.3d 278,
19   284 (9th Cir. 1996). The inherent sanction authority allows a bankruptcy court to deter and provide
20   compensation for a broad range of improper litigation tactics. *Fink v. Gomez*, 239 F.3d 989, 992-
21   93 (9th Cir. 2001). "The inherent sanction authority differs from the civil contempt authority in an
22   additional respect as well. Before imposing sanctions under its inherent sanctioning authority, a
23   court must make an explicit finding of bad faith or willful misconduct . . . [which] consists of
24   something more egregious than mere negligence or recklessness." *Id* at 993-94. The Supreme Court
25   in *Roadway Express, Inc. v. Piper,* 447 U.S. 752 (1980), delivered the definitive summary of the
26   basis on which a federal court may levy sanctions under its inherent power. The Court reiterated
27   the federal courts' inherent power to levy sanctions, including attorneys' fees, for "willful
28   disobedience of a court order ... or when the losing party has acted in bad faith, vexatiously,

wantonly, or for oppressive reasons...." *Id.* at 766. The Court reaffirmed the *Roadway* principles in *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991), emphasizing the continuing need for resort to the court's inherent power, because it is "both broader and narrower than other means of imposing sanctions." *Id.* at 46. On the one hand, the inherent power "extends to a full range of litigation abuses." On the other, the litigant must have "engaged in bad faith or willful disobedience of a court's order." *Id.* at 46-47, 111 S.Ct. 2123. In *Chambers,* the Court left no question that a court may levy fee-based sanctions when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Fink v. Gomez*, 239 F.3d 989, 991-92 (9th Cir. 2001).

### 2. Shellpoint Did Not Intentionally Violate a Court Order to Warrant Sanctions or Contempt

Debtor failed to demonstrate Shellpoint engaged in clearly frivolous or legally unreasonable conduct to warrant sanctions. Before imposing sanctions under its inherent sanctioning authority, a court must make an explicit finding of bad faith or willful misconduct . . . [which] consists of something more egregious than mere negligence or recklessness." *Fink*, 239 F.3d at 992-93.

As discussed above, Shellpoint completed multiple audits to verify its compliance with the Confirmation Order from the First Case. (*See* Exhibit A, Shellpoint Declaration, ¶9). Shellpoint did not engage in vexatious conduct, nor did it willfully violate an order of the court to warrant the extreme and extraordinary remedy of court-ordered sanctions. The Debtor herself does not allege Shellpoint engaged in unreasonable conduct. Debtor's entire Motion for Contempt is based on written communications allegedly remitted by Shellpoint. However, the communications specifically advised they were for informational purposes, in furtherance of Shellpoint's secured interest in the Property, and offering Debtor loss mitigation assistance. The Debtor does not allege she ever contacted Shellpoint and requested Shellpoint no longer send her any correspondence/communications, nor does she allege Shellpoint took any other actions allegedly in violation of the automatic stay, discharge injunction, or Plan. Indeed, following verification of system adjustments to reflect the Confirmed Plan terms, Shellpoint reached out to the Debtor to resolved the default on account. Further, Shellpoint requested the Debtor's participation in the Court's Judicial Settlement Conference. Therefore, Shellpoint did not act in bad faith or with

1   willful misconduct to warrant sanctions under § 105(a).  Accordingly, the Motion for Contempt

2   must be denied.

3

4   **D.    DEBTOR IS NOT ENTITLED TO DAMAGES FOR VIOLATION OF THE DISCHARGE INJUNCTION**

5       **1.    Legal Standard**

6       A discharge "operates as an injunction against the commencement or continuation of an

7   action ... to collect, recover or offset any [discharged] debt as a personal liability of the debtor." 11

8   U.S.C. § 524(a)(2) (2006). A party that knowingly violates the discharge injunction can be held in

9   contempt under § 105(a). *Renwick v. Bennett (In re Bennett),* 298 F.3d 1059, 1069 (9th Cir.2002);

10  *Walls v. Wells Fargo Bank, N.A.,* 276 F.3d 502, 507 (9th Cir.2002). Section 105(a) permits the

11  bankruptcy court to "issue any order ... that is necessary or appropriate to carry out the provisions

12  *176 of this title." An award of damages under section 105(a) is discretionary. *United States v.*

13  *Arkison (In re Cascade Roads, Inc.),* 34 F.3d 756, 767 (9th Cir.1994); *In re Pace,* 67 F.3d 187, 193

14  (9th Cir.1995).

15      The party seeking contempt sanctions for violation of the discharge injunction has the

16  burden of proving, by clear and convincing evidence, that the sanctions are justified. *Espinosa v.*

17  *United Student Aid Funds, Inc.,* 553 F.3d 1193, 1205 n. 7 (9th Cir.2008). Enforcement of a lien is

18  not a violation of the discharge injunction because the discharge injunction by its terms only

19  prohibits efforts to collect debts "as a personal liability of the debtor." *See 11 U.S.C.* § 524. But,

20  "[e]ven if a creditor threatens only to enforce its surviving lien, that threat will violate the discharge

21  injunction **if** the evidence shows that the threat is really an effort to coerce payment of the

22  underlying discharged debt." *See, e.g.,* Marino, 577 B.R. 772, 784 (emphasis added).

23      Together section 524(a)(2) and 105(a) "authorize a court to impose civil contempt sanctions

24  [for attempting to collect a discharged debt] where there is no objectively reasonable basis for

25  concluding the creditor's conduct might be lawful under the discharge order." *Taggart v. Lorenzen*,

26  139 S. Ct. 1795, 1801 (2019). As such, a court may only hold a creditor in civil contempt for

27  violating a discharge order if there is no fair ground of doubt as to whether the order barred the

28  creditor's conduct. *Id.* at 1799. Put differently, if there is "fair ground of doubt" as to whether the

subject order barred the conduct the violator engaged in, the court has the discretion not to hold the alleged violator in contempt of court. *See Id.* at 1804. Based upon the foregoing, the Debtor must prove by clear and convincing evidence that Shellpoint's alleged actions were in violation of the discharge injunction and there was **no objectively reasonable** basis for to Shellpoint to believe it was not in violation of the discharge injunction.

Under *Taggart,* as noted above, a court "may hold a creditor in civil contempt for violating a discharge order where there is," on an "objective" basis, "not a 'fair ground of doubt' as to whether the creditor's conduct might be lawful under the discharge order." *Taggart,* 139 S.Ct. 1795, 1804 (emphasis added; citation omitted). "Under the fair ground of doubt standard," civil contempt "may be appropriate when the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." *Id.* at 1802 (emphasis added).

**2.    The Informational Statements Complied with the Confirmed Plan and Did Not Violate the Discharge Injunction**

First, Debtor's entire case against Shellpoint for alleged violation of the automatic stay and discharge injunction is based solely on the alleged receipt of informational statements in the mail. In the Motion for Contempt, Debtor alleges, "Shellpoint's Billing Statements Violated the Discharge Inunction When Requesting an Improper Amount of Principal and Interest." (*See* Motion for Contempt, Page 104). However, this is untrue. A review of the monthly statements sent by Shellpoint clearly reflect the terms of the Confirmed Plan, including the correct principal balance, interest rate (**5.00%**), and Principal and Interest Payment (**$708.60**). (*See* Exhibit A, Shellpoint Declaration, ¶9).

**3.    The Terms of the Subject Loan and Confirmed Plan Permitted the Payment of Taxes and Insurance.**

Second, while the Debtor complains the monthly payment amount included escrow, the terms of the Subject Loan permitted Shellpoint to pay taxes and insurance on the Debtor's behalf and seek recovery though an escrow impound. (*See* Exhibit B, Deed of Trust). While the pre-confirmation APO contemplated the Debtor's maintenance of taxes and insurance for the Property,

if the Debtor failed to maintain taxes and/or insurance, Shellpoint had the right to pay taxes and insurance for the Property to protect its interests. Notably, the APO did not permanently modify the loan documents with respect to escrow. Rather, any modification of the Subject Loan occurred only through the Confirmed Plan on March 8, 2011, effective March 23, 2011. The Plan did not incorporate the APO by reference or state the APO shall control the treatment of Creditor's Claim in the Plan. Creditor asserts the terms of the Confirmed Plan superseded and replaced and terms in the APO. The Plan itself failed to address the payment of taxes or insurance on the Property post-confirmation. As a result, absent an express modification of escrow in the Confirmed Plan, Creditor asserts the Subject Loan documents and Deed of Trust controlled the payment of taxes/insurance post-confirmation. Thus, when the Debtor failed to maintain taxes and/or insurance in a timely manner, Shellpoint advanced said funds on the Debtor's behalf and sought recovery of said advances through an escrow impound.

### 4.    Shellpoint's Actions were Objectively Reasonable Given the Debtor's Default under the Confirmed Plan

Third, notwithstanding the litany of cases cited by the Debtor in her Motion for Contempt, this is not a Chapter 7 case where the Debtor has a reasonable belief she is no longer liable for making payments on the loan following a discharge order or where the Debtor should not expect to receive written correspondence from Shellpoint regarding the Loan. Moreover, *the Debtor requested* the loan information and statements from Shellpoint on numerous occasions. As such, Debtor's feign outrage for receiving the alleged offending correspondence is disingenuous.

Fourth, the statements allegedly sent to the Debtor included a disclaimer advising the Debtor the correspondences were for informational purposes only and not an attempt to collect the debt from the Debtor personally, but rather to enforce *in rem* rights against the Property. Debtor has not met her burden of showing that the informational statements were an unlawful debt collection in violation of § 524. The monthly statements were not to pressure Debtor to repay a discharged debt. *In re McLean,* 794 F.3d at 1322. Indeed, the Debtor often requested the statements for information directly from Shellpoint.

The fact that the statements included an "amount due," "due date," does not diminish the effect of the prominent, clear, and broadly worded disclaimer. Notably, section 524 allows for a debtor to pay back a discharged debt voluntarily. Under 11 U.S.C. § 524(f), "[n]othing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt."  Debtor had the option to repay the amount due under the Confirmed Plan and thereby retain the Property because Shellpoint had not completed a foreclosure on the Property. If we accepted Debtor's argument that the informational statements were unlawful debt collection under § 524, there would be little daylight between (1) a legitimate attempt by Shellpoint to inform Debtor how she could retain the Property and (2) an unlawful attempt at debt collection in violation of the § 524 injunction. Instead, the statutory scheme clearly allows for Shellpoint to send potentially helpful informational statements to the Debtor without simultaneously casting those statements as debt collection.

In light of these facts, the informational statements sent by Shellpoint were not designed to have the "objective effect" of "pressur[ing] the debtor to pay a discharged debt," in violation of § 524. While subsequent statements included different disclaimers, each statement properly advised the Debtor of the informational nature of the correspondence and made it clear the statements were not an attempt to collect a debt from the Debtor personally. Accordingly, Shellpoint asserts the informational statements were reasonable given the Debtor's default under the Plan. Shellpoint did not believe the statements violated the discharge injunction, automatic stay, or any other provision of the Bankruptcy Code. Thus, Shellpoint asserts is actions were objectively reasonable. (*See* Exhibit A, Shellpoint Declaration, ¶16).

Fifth, the terms of the Confirmed Plan required ongoing payments post-discharge. As discussed above, the Debtor defaulted on payments under the Confirmed Plan. Accordingly, it was objectively reasonable for Shellpoint to send correspondence to the Debtor with offers of assistance and options for loss mitigation. Further, Shellpoint asserts said communications were in furtherance of the enforcement of its *in rem* rights based on the *Debtor's* failure to make payments under the Confirmed Plan, not in furtherance of an attempt to collect a discharged debt from the Debtor personally (as clearly disclosed on each statement). Enforcement of a lien is not a violation of the

discharge injunction because the discharge injunction by its terms only prohibits efforts to collect debts "as a personal liability of the debtor." § 524. *See, e.g., Marino,* 577 B.R. 772, 784.

Thus, it was objectively reasonable for Shellpoint to send monthly statements to the Debtor regarding the account status. As the party seeking contempt sanctions, the <u>Debtor</u> has the burden of proof to show by "clear and convincing" evidence that Shellpoint acted unreasonably given her default under the Plan. *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir. 1999). Debtor has failed to meet her burden.

Based on the foregoing, Shellpoint did not knowingly and willfully violate the discharge injunction or automatic stay. Shellpoint had an objectively reasonable belief the automatic stay was no longer in effect, the communications were proper in accordance with the Debtor's Plan and ongoing relationship amongst the parties, and the informational statements were proper and necessary to enforce its *in rem* rights and/or provide the Debtor with potential loss mitigation options based on her default under the terms of the Confirmed Plan. Shellpoint is informed and believes it is currently in compliance with all court orders. As a consequence, Shellpoint did not knowingly violate the discharge injunction or intend its actions to violate said inunction. Accordingly, damages are inappropriate under 11 U.S.C. §§ 524 or 105(a).

### 5.    Debtor Has Failed to Demonstrate She Suffered Damages or that Shellpoint Caused Said Damages

Assuming *arguendo* Debtor could satisfy the elements for a willful violation of the discharge injunction under section 524 or that the Court finds Shellpoint in contempt under § 105(a), Debtor has failed to establish she is entitled to any damages. The Debtor's Motion for Contempt does not detail or quantify the damages suffered beyond the attorneys' fees incurred to bring the instant Motion for Contempt, and a statement she suffered emotional stress and time/gas driving to her attorneys' office.

a.    <u>Actual Damages</u>

Compensatory damages are recoverable by a debtor for a creditor's violation under a § 105(a) civil contempt motion. *See In re Dyer,* 322 F.3d at 1193 (*Walls v. Wells Fargo Bank, N.A.,* 276 F.3d 502, 507 (9th Cir.2002). Further, "compensatory damages" include those damages that are

"sufficient in amount to indemnify the injured person for the loss suffered," essentially placing the injured party in as good a position as it would have been in absent violation. *See* Black's Law Dictionary 445 (9th ed.2009). However, in order to recover such damages, the party asserting compensatory damages must specifically prove not only the right to damages, but also the amount of damages. In proving compensatory damages, the existence and amount of damages must be based upon more than mere conjecture. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 824 (9th Cir.2001); *McClaran v. Plastic Indus., Inc.,* 97 F.3d 347, 361 (9th Cir.1996); *In re 1601 W. Sunnyside Dr. #106, LLC*, 2010 WL 5481080, at \*6 (Bankr. D. Idaho Dec. 30, 2010).

Debtor failed to quantify what damages she suffered beyond alleging she incurred attorneys' fees to bring the instant Motion for Contempt in the amount of $25,000 and a statement she suffered emotional distress. Further, Debtor stated she spent money on gas, copies, and time going to her attorney's office in the sum of $150. However, in order to recover such damages, the party asserting compensatory damages must specifically prove not only the right to damages, but also the amount of damages. In proving compensatory damages, the existence and amount of damages must be based upon more than mere conjecture. Debtor fails to show causal connection between any action or inaction by Shellpoint and her alleged damages. Further, Debtor fails to quantify for apportion the alleged damages between each defendant. It is unclear how Shellpoint is liable for any of the Debtor's alleged damages (as opposed to some other defendant (Ocwen) or a prior servicer of the loan). Accordingly, the Debtor's request for "actual" damages must be denied.

b.    <u>Emotional Damages</u>:

Debtor asserts she suffered emotional distress over the accounting issues discussed above. However, Shellpoint contends Debtor failed to meet her burden she is entitled compensatory damages for emotional distress. *See, Dawson v. Washington Mutual Bank (In re Dawson)*, 390 F.3d 1139, 1148 (9th Cir. 2004) (individual must prove: 1) suffer significant harm; 2) clearly establish the significant harm; and 3) demonstrate a causal connection between that significant harm and violation of the automatic stay (as distinct from, for instance, the anxiety and pressures inherent in the bankruptcy process).

1    The only assertion of emotional distress includes Debtor's assertion of "emotional strain."

2    (*See* Debtor Declaration, ¶37). This does not sufficiently prove Debtor suffered significant harm.

3    Further, Debtor failed to provide sufficient evidence of a causal connection between the asserted

4    distress and any alleged violation by Shellpoint. Thus, Shellpoint asserts Debtor is not entitled to

5    damages for emotional distress as an element of compensatory damages.

6         c.    Attorneys' Fees and Costs

7    Section 105(a) authorizes only such remedies as are "necessary or appropriate to carry out

8    the provisions of this title." "[C]ivil contempt is the normal sanction for violation of the discharge

9    injunction." 4 *Collier on Bankruptcy* ¶ 524.02[2][c] (15th ed. 1999). Compensatory civil contempt

10    allows an aggrieved debtor to obtain compensatory damages, including attorneys' fees. *Walls v.*

11    *Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002). Courts have applied the standard of §

12    330 for compensating professionals in bankruptcy, which provides for "reasonable compensation

13    for actual, necessary services." 11 U.S.C. § 330(a)(1)(A). *See United States v. Price,* 176 B.R. 807,

14    808 (N.D.Ill.1993), *aff'd,* 42 F.3d 1068 (7th Cir.1994) ("To the extent that services performed are

15    compensable under § 330, attorneys' fees have been incurred by the estate and can be awarded

16    pursuant to § 362(h)."); *Sucre v. MIC Leasing Corp. (In re Sucre),* 226 B.R. 340, 351

17    (Bankr.S.D.N.Y.1998).

18    Courts especially scrutinize cases where the debtor's only injuries are those incurred in

19    litigating the motion for sanctions, and where there exist no circumstances warranting punitive

20    damages. *See McHenry,* 179 B.R. at 168; *Shadduck v. Rodolakis,* 221 B.R. 573, 585 (D.Mass.1998)

21    (requiring a debtor to attempt to resolve the dispute prior to filing a motion for sanctions); *In re*

22    *Craine,* 206 B.R. 594 (Bankr.M.D.Fla.1997) (finding no injury); *In re Brock Utils. & Grading, Inc.,*

23    185 B.R. 719 (Bankr.E.D.N.C.1995) (same); *McLaughlin,* 96 B.R. at 563 (reducing fees). *In re*

24    *Roman,* 283 B.R. 1, 12 (B.A.P. 9th Cir. 2002). When considering damages, the court must consider

25    two factors: "(1) what expenses or costs resulted from the violation and (2) what portion of those

26    costs was reasonable, as opposed to costs that could have been mitigated." *In re Roman,* 283 B.R.

27    1, 12 (9th Cir. BAP 2002).  Further, any such attorneys' fees must be reasonable.  *See, Perry v. O-*

28    *Donnell*, 759 F.2d 702, 706 (9th Cir. 1985).

Here, Debtor failed to plead the amount of attorneys' fees incurred in prosecuting the instant Motion for Contempt against Shellpoint with specificity or adequate documentation. Rather, the Motion for Contempt simply requests an award of attorneys' fees and costs incurred by Debtor for filing the instant Motion for Contempt for an amount to be determined at a hearing. The Debtor's Declaration states Debtor has "spent over $25,000 on attorneys' fees attempting to straighten the account out." (*See* Debtor Declaration, ¶140). Additionally, Debtor contributed to any alleged issues with the account that required "straightening out" by failing to make payments on the Loan for years and also failing to pay the real property taxes and properly insure the Property. Spending attorney's fees to clean up a mess you made are not damages properly attributable to Shellpoint. As discussed above, Shellpoint verified completion of system adjustments *prior to* the filing of the Motion for Contempt as evidenced by the monthly statements sent to the Debtor and Proof of Claim filed in the Third Case. Shellpoint believes Debtor failed to provide ***clear and convincing evidence*** of a discharge violation, Plan violation, or stay violation to warrant a finding of damages.

Moreover, Shellpoint disputes whether any such attorneys' fees and costs incurred in filing the Motion for Contempt are reasonable given Shellpoint's compliance with the Confirmation Order at the time of filing. Further, Debtor failed to participate in the Judicial Settlement Conference in good faith by even entertaining a settlement offer. As a result, Shellpoint asserts Debtor failed to mitigate damages and is not appearing in this Court with clean hands.

### 6.    Debtor Failed to Mitigate Damages

Shellpoint has attempted to engage with the Debtor on numerous occasions in an attempt resolve the default on the Subject Loan and any outstanding compliance issues related to the First Case. However, Debtor failed to respond to Shellpoint's efforts. After continued litigation and little progress towards confirmation in the Third Case, Shellpoint requested the Debtor's participation in a Judicial Settlement Conference in the Third Case. While the Debtor attended the court-ordered Judicial Settlement Conference, Debtor failed to fully comply with the Settlement Order by submitting a settlement offer to Shellpoint or otherwise engaging in good faith negotiations to resolve the disparate between the Parties. Further, the filing of the Motion for Contempt was unreasonable given Shellpoint's compliance with the Confirmation Order at the time of filing, the

1    Debtor's default under the Plan, the termination of the automatic stay years ago. Accordingly,

2    Shellpoint asserts the Debtor failed to mitigate damages and any request for damages must be

3    denied.

4          **7.    Punitive Damages are Not Appropriate in this Case**

5          Similar to her claims for compensatory damages and attorney's fees, Debtor's request for

6    punitive damages is unavailing.  While section 362(k) authorizes an award of punitive damages in

7    appropriate circumstances, *see* 11 U.S.C. § 362(k)(1), a bankruptcy court is not generally authorized

8    to impose punitive sanctions under the contempt authority of section 105(a). *See Dyer*, 322 F.3d at

9    1194; *see also In re Roman*, 283 B.R. 1, 14 (9th Cir. BAP 2002). Even if punitive sanctions were

10   authorized by section 105(a), Debtor would still not be entitled to such an award. Put simply,

11   punitive damages are not warranted where a claimant, like Debtor, has failed to establish a right to

12   recover actual damages. *See e.g., In re McHenry*, 179 B.R. 165, 168 (9th Cir. BAP 1995)(noting

13   that punitive damages should not be awarded in the absence of actual damages). There is otherwise

14   no evidence that Shellpoint acted with a reckless or callous disregard for Debtor's rights, a

15   necessary prerequisite to recovering punitive damages. *See e.g., In re Bloom*, 875 F.2d at 228.

16   Debtors has failed to prove that Shellpoint acted deliberately, maliciously, or in bad faith. Based on

17   the foregoing, Debtor's request for punitive damages must be denied.

18          **IV.    CONCLUSION**

19          Based on above, Debtor's claims for violation of the automatic stay, violation of the

20   discharge injunction and contempt are unwarranted. Shellpoint acted objectively reasonably by

21   sending informational statements to the Debtor following her default under the Confirmed Plan.

22   Shellpoint updated its system to reflect the terms of the Confirmed Plan well before the filing of

23   the instant Motion for Contempt. If any party is *currently* in violation of the Confirmed Plan, it is

24   the Debtor, not Shellpoint. Debtor failed to make all required payments under the Confirmed Plan

25   and subsequently filed numerous bankruptcy cases through her shell entities (while continuing to

26   collect rental income). Debtor failed to mitigate damages and is not appearing before the Court with

27   clean hands. Debtor failed to demonstrate she is entitled to damages or prove said damages are

28

directly attributable to any action or inaction of Shellpoint, or that sanctions are necessary or appropriate.

Based upon the foregoing, Shellpoint respectfully request the Court to deny the Debtor's Motion for Contempt. In the alternative, Shellpoint requests an evidentiary hearing and scheduling order to conduct discovery in this case and potentially file a dispositive motion regarding whether Debtor has met her burden of proof for the alleged violations and/or damages.

**WHEREFORE**: Shellpoint respectfully requests that:

1. The Court enter an Order Denying the Motion for Contempt;

2. In the alternative, the Court issue a scheduling order regarding deadlines to complete discovery and file dispositive motions with an evidentiary hearing to be set (if necessary);

3. The Court award Shellpoint reasonable attorney's fees and costs; and

4. Any additional relief the Court deems appropriate.

Respectfully submitted:

**ALDRIDGE PITE, LLP**

Dated: May 12, 2021

*/s/  Eddie R. Jimenez*
EDDIE R. JIMENEZ
Attorneys for Shellpoint Mortgage Servicing

**CERTIFICATE OF SERVICE**

I, <u>Priscilla Johnson</u> declare that:

I am employed by Aldridge Pite, LLP. My business address is: 4375 Jutland Drive, Suite 200; P.O. Box 17933, San Diego, CA 92177-0933. I am over the age of eighteen years and not a party to this cause.

On May 12, 2021, I caused the **SHELLPOINT MORTGAGE SERVICING'S RESPONSE TO DEBTOR'S MOTION FOR CONTEMPT FOR VIOLATION OF THE AUTOMATIC STAY AND DISCHARGE INJUNCTION, FAILING TO COMPLY WTH COURT ORDER AND THE CONFIRMED PLAN AND FOR DAMAGES INCLUDING ATTORNEYS FEES AGAINST CREDITORS, SHELLPOINT MORTGAGE SERVICING AND OCWEN LOAN SERVICING, LLC [DKT NO. 1334]** to be served on the parties listed herein via electronic means through the Court's CM/ECF system or by placing a copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States Mail, addressed as follows:

Schulte Properties LLC
9811 W. Charleston Blvd Ste 2-351
Las Vegas, NV 89117

Matthew L. Johnson
Johnson & Gubler, P.C.
8831 West Sahara Avenue
Las Vegas, NV 89117
annabelle@mjohnsonlaw.com

U.S. Trustee
Department of Justice
300 Las Vegas Boulevard, SO.
Suite 4300  Las Vegas, NV 89101
USTPRegion17.LV.ECF@usdoj.gov

Melani Schulte
9811 W. Charleston Blvd. #2-351
Las Vegas, , NV 89117

Christopher Patrick Burke
218 S. Maryland Parkway
Las Vegas, NV 89101
atty@cburke.lvcoxmail.com

Dated: May 12, 2021                                     /s/Priscilla Johnson